462 F.2d 217
 Donald S. TRYON and Karen Tryon, Plaintiffs-Appellees,
v.
The FIRST NATIONAL BANK OF SIBLEY, IOWA, and Leo Carlson,
Jr., Executive Vice President and Cashier of the
First National Bank of Sibley, Iowa,
Defend ants-Appellants.
 No. 71-1591.
 United States Court of Appeals,
 Eighth Circuit.
 Submitted May 10, 1972.
Decided June 20, 1972.
 
 Maurice B. Nieland and Robert E. Beebe, Sioux City, Iowa, for defendants-appellants.
 Mr. Donald E. O'Brien, Sioux City, Iowa, for plaintiffs-appellees.
 Before VOGEL, LAY, and BRIGHT, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 Appellees, Donald Tryon and his wife, Karen, brought this diversity action against the First National Bank of Sibley, Iowa (Bank), and its executive vice-president, Leo Carlson. The Tryons' complaint alleged that the Bank, through its agent Carlson, negligently filed a false financing statement whch indicated that the plaintiffs were indebted to the Bank. As a result of this filing, plaintiffs claim that their credit rating was impaired, that they were consequently unable to borrow additional business capital to sustain their business operation, and as a result, they lost substantially all of their assets. The case was tried before a jury which returned a verdict for the plaintiffs in the amount of $50,000. Both defendants appealed the judgment entered upon that verdict. We reverse for the reasons stated below.
 
 
 2
 The Tryons formerly operated a wholesale fishing tackle, sporting goods, and minnow supply business near Spirit Lake, Iowa. Needing additional financing for the expansion of this business, Donald Tryon contacted defendant Carlson seeking a loan from the Bank. Carlson initially refused to approve such a loan because the Tryons lacked sufficient security to justify the advancement of additional credit. Carlson suggested that the Tryons attempt to obtain a cosigner to provide the necessary security for a loan from the Bank. The Tryons then approached one Fred Dowden, who, for a finder's fee of five per cent of the principal amount, agreed to cosign a $20,000 note at the Bank. The Tryons executed a note for that amount and a chattel mortgage on December 10, 1965, in favor of their "cosigner," Fred Dowden. The note was prepared on the Bank's printed form but the name of the Bank was crossed out as the payee and Fred Dowden's name was substituted. The chattel mortgage showed Dowden as mortgagee and referred to Dowden as the payee of the note executed in conjunction with the chattel mortgage. The reverse side of the note contained Fred Dowden's signature and endorsement as follows: "Pay to the order of the First National Bank of Sibley, Sibley, Iowa, WITH FULL RECOURSE." The chattel mortgage was properly filed on December 16, 1965, with the County Recorder for Dickinson County, Iowa.
 
 
 3
 The following July 4, 1966, the Uniform Commercial Code became effective in the State of Iowa, and in August of that year defendant Carlson contacted the Tryons seeking the execution of a standard form financing statement which the Bank intended to file in order to record the Bank's interest in the $20,000 note. The Tryons signed this financing statement and it was recorded with the Dickinson County Recorder and in the office of the Secretary of State.[1]
 
 
 4
 In this action the parties are agreed that, as a result of these transactions, the Tryons owed money only to Dowden. The Bank apparently acted merely as an agent of Dowden in receiving payments on the Tryons' indebtedness. The County Recorder's records, however, not only reflected an indebtedness to Dowden secured by the chattel mortgage, but also indicated an indebtedness to the Bank by virtue of the filed financing statement. The Tryons contended at trial that the Bank wrongfully obtained and negligently filed the financing statement, and that the resultant "double filing" with respect to their indebtedness so impugned their credit position that they could not acquire additional business financing between 1966 and 1968, thus causing their financial ruin. The trial court submitted to the jury the issues of negligence, proximate cause, and damages, denying the defendants' motion for a directed verdict, and their post-verdict motion for judgment n. o. v.
 
 
 5
 On this appeal, the appellants contend that the plaintiffs failed to make out a case of negligence on the part of defendants, or to show that the defendants' negligence, if any, caused the plaintiffs' damages. For the purposes of this appeal, we will assume, without so deciding, that the Tryons succeeded in establishing that the Bank and defendant Carlson were negligent in filing the financing statement which erroneously indicated an indebtedness to the Bank on the part of the Tryons.[2]
 
 
 6
 We turn our attention, therefore, to whether the Tryons demonstrated that their business losses resulted from the "double filing" concerning their indebtedness to Dowden. The burden was on the Tryons to prove that the defendants' negligence, if any, proximately caused their injury. Ford Motor Co. v. Mondragon, 271 F.2d 342, 345 (8th Cir. 1959). In that case we referred to the following explication of the Iowa law which governs a diversity case such as this one:
 
 
 7
 * * * negligence which appears to have no causal connection with the injury is not actionable. It must appear that the injury was the natural and probable consequence of the negligence, wrongful act, or breach of duty. [271 F.2d at 345, citing Fanelli v. Illinois Central R.R., 246 Iowa 661, 69 N.W.2d 13, 19 (1955), and in accord, Brewer v. Johnson, 247 Iowa 483, 72 N.W.2d 556, 558 (1955)].
 
 
 8
 Applying this rule to the evidence viewed most favorably to the Tryons, we are convinced that they failed to establish that the defendants' conduct proximately caused the Tryons' losses. The Tryons offered no direct evidence that the "double filing" effect of the financing statement served as any impediment to the Tryons obtaining additional business loans. Although the Tryons attempted to secure financing through the Small Business Administration and other places, they did not show the reason why these loans were denied.
 
 
 9
 Plaintiffs' claim for damages, allegedly resulting from the "double filing," rests upon Donald Tryon's own, unsupported claim testimony. He testified in part as follows:
 
 
 10
 * * * In my opinion, as shown from my complaint, my loss for loss of credit standing is $25,000 * * *. My complaint shows and my opinion is that from the loss of my entire business and accounts resulting from false filing I lost $100,000. It is my opinion that loss for the attachment and confiscation of my business as the result of the false filing is $25,000. It is my opinion that the loss I suffered and the loss of my homestead and house is $10,000. My loss of ability to make a living is $25,000 and it is my opinion that damages for past loss of reputation is $50,000, and that the future loss I will sustain for loss of reputation for business is $50,000. [App. 33-34]
 
 
 11
 The defendants did not contest the fact that the Tryons suffered financial ruin. Further, defendant Carlson admitted that, in his opinion, the notice given by a financing statement could affect the "borrowing power" of the party denominated as the debtor. On the basis of this evidence and Tryon's additional testimony that he experienced "no luck" in his attempts to secure business financing, appellees urge that the evidence was sufficient for the jury to properly infer that plaintiffs' loss was proximately caused by defendants' negligence.
 
 
 12
 We fail to see how this testimony provides any inference that the "double filing" contributed to the Tryons' business failure. The record shows that the business operated by the Tryons was under-capitalized as early as 1965, and that the Tryons possessed inadequate security to finance their business expansion in that year and in subsequent years. Donald Tryon's testimony disclosed that he had become financially over-extended and unable to pay his debts in 1968 in part because other loan obligations had matured and were unpaid.
 
 
 13
 Without some competent evidence showing a reasonably probable connection between the alleged negligent act and the alleged loss, the jury verdict becomes one resting wholly upon speculation or possibilities, not probabilities. It, therefore, cannot be allowed to stand. See Mondragon, supra, 271 F.2d at 348; Bokhoven v. Hull, 247 Iowa 604, 75 N. W.2d 225, 227 (1956); Brewer v. Johnson, 247 Iowa 483, 72 N.W.2d 556, 558-559 (1955); Fanelli v. Illinois Central R.R., 246 Iowa 661, 69 N.W.2d 13, 19-21 (1955). Accordingly, we remand this case to the district court and direct that it enter a judgment dismissing plaintiffs' cause of action.
 
 
 
 [1]
 In December 1966, a new note was executed by the Tryons in favor of Dowden in the amount of $15,000, representing a renewal for the unpaid balance on the original instrument. This note indicated that it was secured by a "security agreement." Contemporaneously with the execution of this renewal note, the Tryons executed a security agreement in favor of the Bank, and a supplemental security agreement in favor of Fred Dowden and the Bank. These two security agreements, in substance, covered the trucks, inventory, and equipment of the Tryons' business
 
 
 [2]
 Appellees contend that they did not commit any negligent act by filing the financing statement in question, since, under the U.C.C., the Bank could have legitimately looked to the Tryons for payment of the note in the event of Dowden's default. In addition, the defendants insist that the financing statement did not disclose any indebtedness on the part of the Tryons to the Bank, but merely put the world on inquiry that an indebtedness to the Bank might exist. We find it unnecessary to discuss this defense here